# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **VINTAGE ASSETS, INC., et al.** | **CIVIL ACTION** |
| **Plaintiffs** | **NO. 2:16-cv-00713** |
| **v.** | **SECTION H** |
| **TENNESSEE GAS PIPELINE COMPANY, L.L.C., et al.,** | **JUDGE JANE TRICHE MILAZZO** |
| **Defendants** | **MAGISTRATE JUDGE MICHAEL B. NORTH** |

## MEMORANDUM IN SUPPORT OF DEFENDANTS' JOINT MOTION IN LIMINE TO EXCLUDE THE TESTIMONY AND REPORT OF MR. DAVID BATKER, EARTH ECONOMICS

Defendants Tennessee Gas Pipeline Company, L.L.C. ("TGP"), Southern Natural Gas Company, L.L.C. ("SNG"), High Point Gas Transmission, L.L.C., and High Point Gas Gathering, L.L.C. (collectively, "Defendants") submit this memorandum in support of their Joint Motion in Limine to Exclude the Testimony and Report of Mr. David Batker, Earth Economics.

Plaintiffs[1] have offered Mr. Batker as a purported expert for an economic valuation of alleged environmental impacts associated with pipeline canals on the property-in-suit. However, Mr. Batker's proposed testimony is not relevant to ***any*** issue in this case. Mr. Batker concedes that Plaintiffs should not be compensated for the environmental impacts he identifies, which are public losses that are not particular to Plaintiffs. Further, Mr. Batker's methodology is unreliable and will not assist the fact-finder. Accordingly, Mr. Batker's report and expected testimony fail

---

[1] The plaintiffs in this suit (collectively, "Plaintiffs") are:  Vintage Assets, Inc.; Jacques Perez de La Vergne; Suzanne de La Vergne McIntosh; Anne Perez Inabnett; Susan Perez Magee; Joan Elizabeth Heather Huey; John R. Perez, III; Arthur S. Huey, IV; Renee Perez Sachs; and the Mercedes Perez Mack Exempt Trust, Whitney Bank Successor Trustee.  First Suppl. & Am. Compl. ¶ 1, Sept. 27, 2016, ECF No. 31.

to meet the minimum requirements for admissible expert evidence and should be excluded. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

## I.   RELIEF REQUESTED

Defendants respectfully request that the Court grant this motion and exclude the testimony and report of Mr. David Batker from a trial in this case.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs are the purported owners of property in Plaquemines Parish (the "Subject Property").[2]  Between 1953 and 1970, Plaintiffs' predecessors granted at least eight (8) rights-of-way to Defendants.[3]  Pursuant to those rights-of-way, Defendants dredged flotation canals and installed pipelines that traversed the Subject Property.[4]  Plaintiffs filed this suit on December 18, 2015, claiming that Defendants' failure to maintain pipeline canals and canal banks on the Subject Property has resulted in land loss.[5]  Plaintiffs allege that Defendants breached express and implied obligations under the rights-of-way,[6] that Defendants were negligent by failing to maintain canals and canal banks on the Subject Property,[7] and that the continued widening of the canals is a trespass on the Subject Property.[8]

Plaintiffs served a purported expert report from Mr. David Batker on January 13, 2017, and updated that report on May 24, 2017.[9]  Mr. Batker is the chief economist at Earth Economics, which is a non-profit organization applying economic principles to natural

---

[2] *See generally* First Suppl. & Am. Compl. ¶ 4 (definition of the Subject Property).
[3] *Id.* ¶ 9.
[4] *See id.* ¶ 8; *see also* ECF Nos. 114-13, 114-14 (pertinent excerpts of SNG's and TGP's responses to discovery requests from Plaintiffs).
[5] *See* Pet'n for Damages, ECF No. 1-1 (attached to Notice of Removal).
[6] *See* First Suppl. & Am. Compl. ¶¶ 21-28.
[7] *See id.* ¶¶ 29-36.
[8] *See id.* ¶¶ 37-40.
[9] *See* Ex. 2, Rep. of David Batker, May 24, 2017.

8764616_5

systems.[10]  Mr. Batker's report includes a purported economic valuation of the land loss to the Subject Property caused by the dredging and lack of maintenance of canals on the property.[11] The report alleges that 49.17 acres of land have been lost due to lack of canal maintenance and quantifies the purported historic value of such land loss at $27 million.[12]  Mr. Batker also opines that the net present value of future losses to the Subject Property is $20.1 million, for a "conservative underestimate of damages" equal to $47.1 million.[13]

To arrive at these figures, Mr. Batker considers several categories of losses, including both "market"[14] and "non-market"[15] values of "ecosystem services."  Mr. Batker defines these "ecosystem services" as "functions that provide human benefits, . . . [i.e.,] the conditions and processes through which natural ecosystems, and the species that make them up, sustain and fulfill human life."[16]  As the name suggests, "market" ecosystem services include "market goods" that "are traded in markets."[17]  By contrast, "non-market" ecosystem services "cannot be bought or sold in a market."[18]  Such "non-market" ecosystem services "are intangible and non-exclusive, meaning that they cannot be held and consumed in discrete units."[19]  In other words, these services are "public goods and services" with benefits that are not particular to any landowner but instead inure to "the health and well-being of the Louisiana coastal economy and over 2.2 million people who live in the Mississippi River Delta and Chenier Plain . . . ."[20]

---

[10] *Id.*, app. B (David Batker's resume).
[11] *See id.* at 1-2.
[12] *Id.* at 42-43.
[13] *Id.* at 43.
[14] *Id.* at 21-22, 30.
[15] *Id.* at 22-26, 30-33.
[16] *Id.* at 10 (citation and internal quotation marks omitted).
[17] *Id.* at 6.
[18] *Id.*
[19] *Id.* at 13.
[20] *Id.* at 41.

3

Mr. Batker attempts to determine directly the market values of alligators, furbearers, and commercial fishing.[21]  He also utilizes a "benefit-transfer" methodology to derive purported values for "non-market" ecosystem services.[22]  This "benefit-transfer" method "draws previously established values from valuation studies of similar goods or services in identical or comparable locations" and applies the "derived values and other information . . . to a new, but sufficiently similar, site."[23]  Mr. Batker presents an opinion valuing the following "non-market" ecosystem services:  aesthetic information, carbon sequestration, disaster risk reduction, habitat and nursery, recreation, soil erosion control, and water quality.[24]  Mr. Batker's report includes both the historic losses of ecosystem services[25] and projected future losses based on an assumed constant rate of land loss over the period 2020 to 2070.[26]  He also purports to value the benefits of restoring both permitted and non-permitted acreage on the Subject Property.[27]

Defendants submit this motion seeking to exclude Mr. Batker's testimony and report because Mr. Batker fails to provide relevant and reliable evidence that will assist the Court in resolving the issues in this case.  *See* Fed. R. Evid. 401-403, 702-703; *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

## III.    LEGAL STANDARD

"Irrelevant evidence is not admissible."  Fed. R. Evid. 402.  "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."  Fed. R. Evid. 401.  Further, even if evidence might be relevant, the Court should exclude such evidence "if its probative value is

---

[21] *Id.* at 21-22.
[22] *Id.* at 17-18.
[23] *Id.* at 17.
[24] *Id.* at 23-24.
[25] *Id.* at 19-27.
[26] *Id.* at 28-34.
[27] *Id.* at 36-37.

substantially outweighed by a danger of one or more of the following:  unfair prejudice, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.  For a bench trial, "[e]xcluding relevant evidence . . . because it is cumulative or a waste of time is clearly a proper exercise of the judge's power . . . ."  *Gulf States Utils. Co. v. Ecodyne Corp.*, 635 F.2d 517, 519 (5th Cir. Unit A Jan. 1981).

A lay witness generally may not provide opinion testimony.  *See* Fed. R. Evid. 701.  By contrast, a witness, "qualified as an expert by knowledge, skill, experience, training, or education," may provide opinion testimony if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  Further, expert testimony based on otherwise inadmissible facts or data can only be presented "[i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject" of the testimony.  Fed. R. Evid. 703.

"[T]he trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993).  This determination requires assessing "whether the reasoning or methodology underlying the testimony is scientifically valid and [] whether that reasoning or methodology properly can be applied to the facts in issue."  *Id.* at 592-93.  The U.S. Supreme Court has identified four non-exclusive factors guiding the reliability inquiry, including: (1) whether the underlying theory or technique has been and can be tested; (2) whether that theory or technique "has been subjected to peer review and publication"; (3) "the known or potential rate of error"

for the theory or technique; and (4) general acceptance by the expert community.  *Id.* at 593-94; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149-50 (1999) (applying the *Daubert* standard to expert testimony based on technical or other specialized knowledge).

"The proponent of expert testimony bears the burden of establishing the reliability of the expert's testimony."  *Sims v. Kia Motors of Am., Inc.*, 839 F.3d 393, 400 (5th Cir. 2016).

## IV.   ARGUMENT

Mr. Batker's testimony should be excluded from a trial in this case for three reasons. ***First***, the subject matter of Mr. Batker's testimony and report is irrelevant to each of the issues before the Court and, therefore, will not "help the trier of fact to understand the evidence or to determine a fact in issue . . . ."  Fed. R. Evid. 702(a); *see also* Fed. R. Evid. 401-402.  ***Second***, Mr. Batker's testimony and report, even if relevant, are unnecessary and risk the needless presentation of cumulative evidence and wasted time.  *See* Fed. R. Evid. 403.  ***Third***, Mr. Batker's analysis is unreliable because: (1) it suffers from confirmation bias; (2) Mr. Batker utilizes the wrong methodology to value the Subject Property; (3) Mr. Batker's benefits-transfer methodology is untestable; (4) Mr. Batker relies on an unsupported assumption for his valuation of ecosystem services; and (5) Mr. Batker's analysis of purported future damages is speculative. *See* Fed. R. Evid. 702(b)-(d), 703; *Daubert*, 509 U.S. at 593-94.  Accordingly, Defendants request that the Court grant this motion in limine and exclude Mr. Batker's testimony and report.

### A.      Mr. Batker's Testimony and Report Are Irrelevant

Mr. Batker purports to value land loss to the Subject Property based on market and non-market "ecosystem services."  But Mr. Batker admits that each of the "ecosystem services" he considers are benefits to the public, not to Plaintiffs.  Mr. Batker also concedes that he has no evidence of actual losses to Plaintiffs.  Accordingly, because his analysis is irrelevant to each of the issues in this case, Mr. Batker's testimony and report should be excluded.

Plaintiffs allege that Defendants are liable for the failure to maintain canals and canal banks on the Subject Property.[28]  Defendants have admitted that they did not maintain canals or canals banks associated with their pipelines on the property.[29]  Accordingly, the only issues for the Court are: (1) whether the canals at issue have widened; (2) whether the pertinent right-of-way agreements imposed any express or implied duties to maintain canals and canal banks; and (3) if so, whether damages have occurred.  Mr. Batker's testimony is irrelevant to each issue.

*First*, Mr. Batker offers no independent opinion on whether canals on the Subject Property have widened.  Instead, he adopts Dr. Sherwood Gagliano's (now Dr. John Day's) analysis of land loss in its entirety.[30]  "While an expert can rely on another expert's findings or opinions in developing his own opinions, he cannot simply adopt wholesale the ideas of another expert without any independent analysis."  *In re Fluidmaster, Inc., Water Connector Components Prods. Liab. Litig.*, No. 14-cv-5696, 2017 WL 1196990, at *24 (N.D. Ill. Mar. 31, 2017); *see also Hunt v. McNeil Consumer Healthcare*, 297 F.R.D. 268, 275 (E.D. La. 2014) ("As many courts have recognized, expert testimony based solely or primarily on the opinions of other experts is inherently unreliable.").  Therefore, Mr. Batker can provide no relevant or admissible testimony regarding the widening of canals on the Subject Property.

*Second*, Mr. Batker offers no opinion on whether the right-of-way agreements at issue in this case impose any duties for the maintenance of canals and canal banks on the Subject

---

[28] *See* First Suppl. & Am. Compl. ¶¶ 11-19.

[29] *See* ECF Nos. 118-39, 118-40.

[30] *See* Ex. 1, Dep. of David Batker, at 31:11-:22 ("Q.  Is it your opinion that the 49 acres in this case would have been here even though natural land loss is occurring on this property?  A.  Yes. Q.  This is your opinion?  A.  It's not my opinion.  It is from the CEI report.  Q.  So you don't have any opinion as to land loss and the causes? . . . A.  No.  We rely on the CEI report.").

Property.[31]  His report is instead limited to a purported valuation of public harms to ecosystem services from the alleged land loss.[32]  Therefore, Mr. Batker can offer no relevant testimony on the issue of whether Defendants had a duty to maintain canals and canal banks.

*Third*, Mr. Batker has no relevant information or opinion on cognizable damages for Plaintiffs' alleged harms.  In fact, Mr. Batker admits that he does not believe that Plaintiffs should be compensated for the alleged harms to "ecosystem services" due to land loss on the Subject Property.[33]  And, tellingly, courts have not authorized private recovery based on harms to "ecosystem services."  *Cf. Public Employees for Envtl. Responsibility v. Schroer*, No. 3:14-cv-589-HBG, 2017 WL 943942, at *6 (E.D. Tenn. Mar. 9, 2017) (dismissing claims for losses of "wetland ecosystem services" because the plaintiff failed to establish particularized injury or impact as required for Article III standing).  *On this basis alone*, Mr. Batker's testimony should be excluded.

With regard to Plaintiffs' breach-of-contract claims, damages "are measured by the loss sustained by the obligee and the profit of which he has been deprived."  La. Civ. Code art. 955.  Such damages "should place the non-breaching party 'in the same position he would have been in' had the contract been fulfilled."  *In re Bankston*, 749 F.3d 399, 403 (5th Cir. 2014) (quoting *Gibbs Constr. Co. v. Thomas*, 500 So. 2d 764, 770 (La. 1987)).  Therefore, contract damages are limited strictly to *Plaintiffs'* losses caused by the alleged failure to maintain canals and canal banks.  Likewise, Plaintiffs' tort remedies are either the diminution in the value of the Subject

---

[31] *See* Ex. 1, Dep. of David Batker, at 49:3-:8 ("Q. . . . You're not going to provide any testimony as to what was required under the right-of-ways or any permit or any statute applicable to this case?  A.  I am relying on the CEI report.").

[32] *See* Ex. 1, Dep. of David Batker, at 72:17-73:17.

[33] *See* Ex. 1, Dep. of David Batker, at 74:7-:8 ("So it [i.e., Mr. Batker's report] doesn't have anything to do with whatever the cost of remediation is."); *id.* at 74:19-:20 ("We were not trying to set a level of compensation here."); *id.* at 76:18-:21 ("Q.  But you're not advocating that the plaintiffs received money for damages to the public?  A.  No.").

Property or the cost of restoration for the property.  *See Roman Catholic Ch. v. La. Gas Serv. Co.*, 618 So. 2d 874, 879 (La. 1993).

Mr. Batker fails to identify any particularized harms to Plaintiffs to support either contract or tort damages.  Plaintiffs averred during depositions that they are only seeking to have the Subject Property restored.[34]  But Mr. Batker admits that his analysis "doesn't have anything to do with whatever the cost of remediation is."[35]  He has no evidence that Plaintiffs have lost any revenue related to land loss on the Subject Property.[36]  In fact, Mr. Batker offers no opinion regarding whether Plaintiffs have suffered any economic losses.[37]  To the contrary, Mr. Batker testified during his deposition that:

- None of his reliance materials specifically evaluate Plaintiffs' property.[38]

- Mr. Batker has no site-specific information regarding:

  - whether the Subject Property supports any ports in the area;[39]

  - whether commercial[40] or recreational[41] fishing occurs on the Subject Property;

  - whether alligators are harvested on the Subject Property;[42]

  - whether trapping occurs on the Subject Property;[43]

  - whether the Subject Property is used for hunting;[44]

---

[34] *See* Ex. 3, Dep. of Anne Perez Inabnett, at 101:1-:3; Ex. 4, Dep. of Arthur S. Huey, IV, at 78:14-:16; Ex. 5, Dep. of Jacques Perez de La Vergne, at 23:12-:14; Ex. 6, Dep. of Joan Elizabeth Heather Huey, at 145:6-:20; Ex. 7, Dep. of Susan Perez Magee, at 134:21-135:7.
[35] Ex. 1, Dep. of David Batker, at 74:7-:8.
[36] *See* Ex. 1, Dep. of David Batker, at 8:3-:7, 34:10-35:18 (Mr. Batker admitting that he does not know if Plaintiffs have generated any revenues from the Subject Property).
[37] *See* Ex. 1, Dep. of David Batker, at 80:15-81:15 (no opinion on economic losses, did not "evaluate any economic value actually received by the landowners," and has no information "about the actual dollars generated for anyone through use of this property at any point in time").
[38] *See* Ex. 1, Dep. of David Batker, at 70:13-:16.
[39] *See* Ex. 1, Dep. of David Batker, at 99:1-:19.
[40] *See* Ex. 1, Dep. of David Batker, at 109:6-:9.
[41] *See* Ex. 1, Dep. of David Batker, at 177:24-178:22, 180:7-:13.
[42] *See* Ex. 1, Dep. of David Batker, at 122:5-:18, 123:6-:20.
[43] *See* Ex. 1, Dep. of David Batker, at 139:2-141:13.

8764616_5

- whether the Subject Property is used for birdwatching;[45]

- whether the populations of alligators;[46] nutria, raccoons, coyotes, muskrats, mink, or other furbearers;[47] blue crab, black drum, king mackerel, menhaden, shrimp, white shrimp, or red snapper;[48] or birds[49] have decreased on the Subject Property;[50]

- whether land loss on the Subject Property has interfered with boating on the property;[51] and

- whether the habitats for furbearers; blue crab; brown, pink, and white shrimp; or migratory nesting birds have diminished on the Subject Property.[52]

- Mr. Batker has no evidence that Plaintiffs have received compensation or revenue from anyone related to alligator hunting; furbearers; commercial fishing; duck hunting; birdwatching; storm reduction; soil retention; water quality; habitat support; carbon sequestration; or traveling to see the property.[53]

Plaintiffs also concede that they do not personally use the Subject Property[54] and that the property is not used for, e.g., windsurfing, swimming, wildlife watching, kayaking, tourism, oyster leasing, boating, oil and gas exploration, raw materials, food production, or supplying water.[55]  As a result, Mr. Batker agrees that his valuations of "ecosystem services" apply equally

---

[44] *See* Ex. 1, Dep. of David Batker, at 146:20-:23, 147:14-:16.

[45] *See* Ex. 1, Dep. of David Batker, at 156:9-157:23.

[46] *See* Ex. 1, Dep. of David Batker, at 123:6-:20.

[47] *See* Ex. 1, Dep. of David Batker, at 129:17-:22, 130:4-133:18.

[48] *See* Ex. 1, Dep. of David Batker, at 137:15-138:14.

[49] *See* Ex. 1, Dep. of David Batker, at 158:11-:20.

[50] *See also* Ex. 1, Dep. of David Batker, at 182:8-:11 ("Q. . . . [W]e don't have any type-specific data to show any population decreasing with the time . . . ; correct?  A.  Correct.").

[51] *See* Ex. 1, Dep. of David Batker, at 201:7-:21.

[52] *See* Ex. 1, Dep. of David Batker, at 233:11-234:15.

[53] *See* Ex. 1, Dep. of David Batker, at 159:2-:23, 209:13-:16, 212:24-213:18, 225:7-:17, 230:17-231:6, 233:11-234:15, 234:19-235:3, 237:23-:25.

[54] *See* Ex. 5, Dep. of Jacques de La Vergne, at 22:24-:25, 26:9-:16; Ex. 7, Dep. of Susan Perez Magee, at 92-94; Ex. 4, Dep. of Arthur S. Huey, IV, at 59; Ex. 3, Dep. of Anne Perez Inabnett, at 77-78; Ex. 6, Dep. of Joan Elizabeth Heather Huey, at 35; Ex. 8, Dep. of Renee Perez Sachs, at 20:7-:9, 31:13-:20, 36:5-:7; Ex. 9, Dep. of Joe M. Inabnett, at 57:3-:7; Ex. 10, Dep. of John Rene Perez, III, at 12:10-:17, 71:8-:12.

[55] *See, e.g.,* Ex. 3, Dep. of Anne Perez Inabnett, at 70:17-78:6; Ex. 4, Dep. of Arthur S. Huey, IV, at 55:13-60:1; Ex. 6, Dep. of Joan Elizabeth Heather Huey, at 56:2-61:14; Ex. 7, Dep. of Susan Perez Magee, at 92:5-99:25.

to any property in the Coastal Zone in Plaquemines Parish, or even in the Breton Sound.[56] Accordingly, Mr. Batker can offer no relevant testimony regarding damages suffered by Plaintiffs in this case.

Instead, Mr. Batker's report considers *public* losses of "market" and "non-market" "ecosystem services."  Mr. Batker defines such "ecosystem services" as "functions that provide human benefits, . . . [i.e.,] the conditions and processes through which natural ecosystems, and the species that make them up, sustain and fulfill human life."[57]  Therefore, by definition, these "ecosystem services" are public benefits that are not particular to any landowner.  Instead, such services allegedly support "the health and well-being of the Louisiana coastal economy and over 2.2 million people who live in the Mississippi River Delta and Chenier Plain . . . ."[58]  Mr. Batker has further admitted during his deposition that carbon sequestration; water quality; soil retention; habitat; disaster risk reduction; aesthetic information; recreational boating; recreational fishing; recreational birdwatching; recreational duck hunting; commercial fishing; furbearers; and alligators are all public benefits.[59]  He agrees that, in the case of carbon sequestration, no market exists in Louisiana for such benefits.[60]

In short, Mr. Batker's report and proposed testimony have no bearing on the Subject Property or on harms suffered by Plaintiffs due to land loss from the alleged failure to maintain

---

[56] Ex. 1, Dep. of David Batker, at 244:6-:20, 253:21-255:25.

[57] Ex. 2, Rep. of David Batker, at 10 (citation and internal quotation marks omitted).

[58] Ex. 2, Rep. of David Batker, at 41.

[59] *See* Ex. 1, Dep. of David Batker, at 239:13-242:18; *see also id.* at 107:22-:23 (reduced wave action is a public benefit); *id.* at 109:10-:18 (nitrogen uptake and carbon sequestration are public benefits); *id.* at 205:7-:22 (aesthetic information is a public benefit); *id.* at 225:7-:17 (soil retention is a public benefit); *id.* at 284:2-:10 ("Q.  You're not saying that this property has generated millions of dollars for these plaintiffs from '56 to the present are you?  A.  No.  I'm saying that it has provided millions of dollars in public benefits.").

[60] *See* Ex. 1, Dep. of David Batker, at 234:19-235:3; *see also* Ex. 2, Rep. of David Batker, at 24-25.

pipeline canals and canal banks.  Because Mr. Batker's report and testimony are irrelevant to every issue in this case, they should be excluded from trial.

### B.   The Risk of Wasted Time and of Cumulative Evidence Outweighs Any Probative Value from Mr. Batker's Testimony and Report

To the extent that Mr. Batker's testimony and report have any relevance to the issues in this case, which is denied, admitting Mr. Batker's opinion will risk wasted time and will result in the presentation of cumulative evidence.  Accordingly, Mr. Batker's testimony and report should be excluded.  *See* Fed. R. Evid. 403, 702(a).

As discussed above,[61] Mr. Batker agrees that he is "not trying to set a level of compensation" for Plaintiffs and that his report "doesn't have anything to do with whatever the cost of remediation is."[62]  When asked to describe the purpose of his report, Mr. Batker testified:

> Q.  I just want to understand what's the purpose?  How is it going to help the Court?
>
> A.  The purpose of this study was to look at the full suite of damages caused by the loss of – the acreage loss due to the lack of maintenance for the pipeline. . . . The purpose was to provide the Court with an understanding of the value of the damages because much of the value of Louisiana wetlands is nonmarket value. . . . It's the damages to the public – . . . It includes damages to the public in general . . . .[63]

In other words, Mr. Batker's testimony is not about compensatory damages.  It is not about the expected costs of remediating the Subject Property.  Instead, the *only* assistance that Mr. Batker purports to provide for the Court is to analyze the public value of coastal Louisiana wetlands restoration.  Such testimony is unnecessary and should be excluded.

It is true that certain federal and state statutes authorize government trustees to seek recovery for "natural resource damages" affecting the public.  *See, e.g.*, 42 U.S.C. § 9607(f)(2)

---

[61] *See supra* Part IV.A.
[62] Ex. 1, Dep. of David Batker, at 74:7-:8.
[63] Ex. 1, Dep. of David Batker, at 72:15-76:21.

(federal and state officials can serve "on behalf of the public as trustees for natural resources" under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA")); *Natural Resource Damage Assessments*, 51 Fed. Reg. 27,674 (1986) (establishing agency procedures for assessing damages to natural resources under CERCLA or the Clean Water Act); *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on Apr. 20, 2010*, MDL No. 2179, 2016 WL 1394949, at *10-14 (E.D. La. Apr. 4, 2016) (discussing payments to the United States and the Gulf States from natural resources damages resulting from the Deepwater Horizon incident).  But this case does not involve any such claims.  Instead, Plaintiffs, who are *private* landowners, are seeking damages and injunctive relief for their *personal* losses related to erosion from the Defendants' alleged failure to maintain pipeline canals and canal banks on the Subject Property.[64]  Therefore, Mr. Batker's non-compensatory valuation of the Subject Property cannot be helpful to the fact-finder because it does not reflect *Plaintiffs'* interests in the property.[65]

Further, information about Plaintiffs' interests is already available in the record.  Mr. Batker testified during his deposition that he spoke with Jacques de La Vergne, Arthur S. Huey, IV, and Christian Fatzer after issuing his report.[66]  His colleague spoke separately with Anne Perez Inabnett.[67]  During these meetings, Mr. Batker "went through [his] list of [ecosystem services] benefits, and [Plaintiffs] confirmed that those are important to them. . . . They showed and – discussed a tremendous amount of sort of cultural historic value, value to their family."[68]

---

[64] *See* First Suppl. & Am. Compl. ¶ 41 (prayer for relief).
[65] *See also* Ex. 11, Dep. of William Desvousges, Ph.D., at 184:2-:10 ("Q.  Are you aware that the landowners are not seeking to recover the $47 million in damages Mr. Batker calculated? . . . THE WITNESS:  I have no idea what the landowners are trying to recover.").
[66] Ex. 1, Dep. of David Batker, at 15:7-:18.
[67] Ex. 1, Dep. of David Batker, at 15:18-:20.
[68] Ex. 1, Dep. of David Batker, at 8:11-10:2.

8764616_5

In other words, Mr. Batker's opinions merely recount Plaintiffs' statements of their personal interests in the Subject Property.[69]  Such information has already been provided *by Plaintiffs* during their depositions,[70] and there is no indication that Plaintiffs will be unavailable to testify at trial.

In short, there is no need in this case for a valuation of historic losses of "ecosystem services" on the Subject Property.[71]  There is no need for a damage assessment of speculative future losses.[72]  And there is no need for Mr. Batker's purported valuation of the benefits to the public from restoring land loss on the Subject Property.[73]  Admitting Mr. Batker's testimony and report in this matter will only result in wasted time and the presentation of cumulative evidence and will provide no assistance for the Court.  *Cf.* Fed. R. Evid. 403, 702(a); *Gulf States Utils. Co.*, 635 F.2d at 519.  Accordingly, Defendants request that the Court grant this motion and exclude Mr. Batker's testimony and report from trial.

### C.      Mr. Batker's Testimony and Report Are Unreliable

Mr. Batker's testimony and report are also unreliable for at least five reasons.  **First**, Mr. Batker's analysis contains irreparable confirmation bias.  Specifically, Mr. Batker made no effort *before* preparing his report to ascertain which "ecosystem services" are present on the Subject Property and are valued by Plaintiffs.  **Second**, Mr. Batker applies the wrong methodology to

---

[69] *See* Ex. 1, Dep. of David Batker, at 18:1-:22 (discussion of information provided by Jacques de La Vergne); *id.* at 28:8-:25 (information from Arthur S. Huey, IV); *id.* at 45:15-46:15 (information from Christian Fatzer); *id.* at 49:11-:23 (Anne Perez Inabnett); *see also id.* at 242:9-:18 ("Q.  The commercial fishing, birdwatching, recreational birdwatching, recreational fishing, recreational boating, nonmarket ecosystems, aesthetic, disaster risk reduction, habitat, solar retention, water quality, and carbon sequestration are all public benefit; correct?  A.  *These are benefits that the landowners have identified as important to them.*" (emphasis added)).

[70] *See* Ex. 5, Dep. of Jacques de La Vergne, at 77:2-:10; Ex. 7, Dep. of Susan Perez Magee, at 43:21-:24; Ex. 3, Dep. of Anne Perez Inabnett, at 43, 50-51, 77; Ex. 6, Dep. of Joan Elizabeth Heather Huey, at 65; Ex. 8, Dep. of Renee Perez Sachs, at 38:21-40:2.

[71] *See* Ex. 2, Rep. of David Batker, at 19-28.

[72] *See* Ex. 2, Rep. of David Batker, at 28-36.

[73] *See* Ex. 2, Rep. of David Batker, at 36-41.

14

value the Subject Property because he ignores the market value of the property. **Third**, Mr. Batker's benefits-transfer analysis of "non-market ecosystem services" is both incomplete and untestable. **Fourth**, Mr. Batker relies extensively on an unsupported assumption that a decrease in wetlands acreage results in a proportionate decrease in "ecosystem services" on the Subject Property. And *fifth*, Mr. Batker's valuation of alleged future damages on the Subject Property is speculative. Any one of these bases necessitates exclusion of Mr. Batker's testimony and report.

### 1.    Mr. Batker's Analysis Suffers from Confirmation Bias

Because Mr. Batker's valuation of ecosystem services on the Subject Property is irreparably tainted by confirmation bias, Mr. Batker's analysis is unreliable and should be excluded under Rule 702.

Mr. Batker admits in his report that "[i]n understanding the value of wetlands, and particularly the Vintage Assets property, it is important to understand what is produced on that property."[74] Yet Mr. Batker conducts his analysis in reverse, warranting exclusion. *Cf. Brown v. Burlington N. Santa Fe Ry. Co.*, 765 F.3d 765, 776 (7th Cir. 2014) ("And if Dr. Fletcher failed to follow his own stated methods, the court could reasonably conclude that he had failed to follow any reliable method."); *Wessman v. Gittens*, 160 F.3d 790, 805 (1st Cir. 1998) ("Because Dr. Trent failed to follow his own prescribed scientific methodology for collecting data on the one issue central to his hypothesis about achievement gap causation, the trial court could not credit his conclusions.").

Mr. Batker admitted during his deposition that he did not speak with Plaintiffs prior to submitting his report.[75] It was only *after* he finished his report that he and his colleagues spoke

---

[74] Ex. 2, Rep. of David Batker, at 7.
[75] Ex. 1, Dep. of David Batker, at 10:3-12:9 (admitting that Mr. Batker "didn't have any opportunity to talk with them [the landowners] directly when we were doing our report" and he "did not speak with them [i.e., Plaintiffs] directly" before issuing his report).

with four Plaintiffs—Jacques de La Vergne; Anne Perez Inabnett, Christian Fatzer, and Arthur S. Huey, IV[76]—regarding whether Plaintiffs valued the ecosystem services that Mr. Batker identified.[77]   During this meeting, Mr. Batker "went through [his] list of benefits, and they [i.e., Plaintiffs] confirmed that those are important to them . . . ."[78]  Mr. Batker further testified:

> Q.   . . . [A]ll of the items that you identified . . . all of that information was included in your report before you spoke with the plaintiffs in this case; correct?
>
> A.  Before I spoke with them individually, that is correct.
>
> Q.  . . . [T]hey affirmed it after you issued your report; correct?
>
> A.  To me personally, yes.[79]

By failing to speak with Plaintiffs prior to preparing his report, Mr. Batker was unable to ascertain "what is produced on the property"[80] and what, if any, ecosystem services Plaintiffs value.  Mr. Batker's belated attempt to obtain this information from Plaintiffs cannot resolve this problem because, as he admits, Plaintiffs merely "confirmed" Mr. Batker's conclusions based on a list that Mr. Batker drafted.[81]  This backward approach introduced incurable confirmation bias into Mr. Batker's analysis, warranting exclusion.  *See Tyree v. Boston Scientific Corp.*, 54 F. Supp. 3d 501, 556 (S.D.W. Va. 2014) (finding that an expert opinion was unreliable and inadmissible where, inter alia, the expert could not explain how he controlled for confirmation bias); *cf. Vail Assocs., Inc. v. Vend-Tel-Co.*, 516 F.3d 853, 864 n.8 (10th Cir. 2008) (affirming a district court's exclusion, under *Daubert*, of survey evidence that "suffered from question bias, interviewer bias, location bias, participant bias, and timing bias").

---

[76] Ex. 1, Dep. of David Batker, at 15:7-:18.
[77] Ex. 1, Dep. of David Batker, at 18:1-:22 (discussion with Jacques de La Vergne); *id.* at 28:8-:25 (Arthur S. Huey, IV); *id.* at 45:15-46:15 (Christian Fatzer); *id.* at 49:11-:23 (Anne Perez Inabnett).
[78] Ex. 1, Dep. of David Batker, at 8:11-10:2.
[79] *See* Ex. 1, Dep. of David Batker, at 10:3-12:9.
[80] *Id.*
[81] Ex. 1, Dep. of David Batker, at 8:11-12:9.

Mr. Batker's assessment of the Subject Property therefore fails to account ex ante for ecosystem services present on the property and valued by Plaintiffs.  His post hoc attempt to confirm his approach has tainted the analysis with confirmation bias.  Mr. Batker's testimony and report therefore must be excluded as unreliable.

### 2. Mr. Batker Utilizes the Wrong Methodology for Valuing the Subject Property

Mr. Batker testified during his deposition that, because Plaintiffs are purportedly not "willing sellers," there is no market value for the Subject Property.[82]  For this reason, Mr. Batker attempts to value the market and non-market "ecosystem services" on the Subject Property instead of assessing the property's market value.[83]  This approach is fundamentally flawed, warranting exclusion of Mr. Batker's testimony and report.

Mr. Batker admits that wetlands properties are bought and sold throughout Louisiana and can be appraised.[84]  He also concedes that banks, financial institutions, and the real estate market rely on such appraisals for valuing wetlands in the Breton Sound.[85]  Tellingly, Mr. Batker could not identify any other sale of property in the Breton Sound that has applied his "ecosystem services" valuation methodology.[86]  Further, Mr. Batker has no experience using his methodology to value privately-held property before any court in the United States and cannot identify any other cases where a court has adopted that methodology.[87]

The undisputed facts establish that it is possible to assign a market value to the Subject Property—i.e., through an appraisal that estimates what a willing buyer would be willing to pay.

---

[82] Ex. 1, Dep. of David Batker, at 37:22-38:3 ("[Y]ou have to have a willing buyer and a willing seller to sell property."); *id.* at 38:9-:15 ("[I]f you don't have a willing seller and a willing buyer, the marketplace does not define a value for that property.").
[83] Ex. 2, Rep. of David Batker, at 5-14.
[84] Ex. 1, Dep. of David Batker, at 41:8-:15.
[85] Ex. 1, Dep. of David Batker, at 43:14-44:23.
[86] Ex. 1, Dep. of David Batker, at 43:14-44:23.
[87] Ex. 1, Dep. of David Batker, at 64:24-66:9.

Mr. Batker's only response is that the Subject Property is purportedly in "an area where land is in collapse," meaning that "the[] market values do not reflect true value."[88]   But Mr. Batker concedes that there is no evidence of a collapse in price for properties in this area between 1930 and the present.[89]   An expert cannot rely on such unsupported assumptions to meet the *Daubert* standards for reliability.   *See MGE UPS Sys., Inc. v. GE Consumer & Indus., Inc.*, 622 F.3d 361, 367 (5th Cir. 2010) (noting that a district court struck an expert's testimony that was "based on insufficient facts and data, including unsupported assumptions"); *Slatten, LLC v. Royal Caribbean Cruises Ltd.*, No. 13-673, 2014 WL 5393341, at *4 (E.D. La. Oct. 23, 2014) (granting a motion to exclude expert testimony where the expert provided "nothing linking his premise to his conclusion except the unsupported assumption that all of the past breakaways . . . were caused by (unidentified) defects in safety operations or improper mooring").

In short, contrary to Mr. Batker's assertions, it is possible to assign a market value to the Subject Property, and third parties routinely rely on market values for assessing gains and losses in the value of the property.   By contrast, Mr. Batker's "ecosystem services" valuation has not been applied either in the markets for wetlands properties or in U.S. courts.   Mr. Batker's testimony and report should therefore be excluded.

### 3.     Mr. Batker's Benefits-Transfer Methodology Is Incomplete and Not Testable

Mr. Batker utilizes a so-called "benefits-transfer" methodology to assign values to the following ecosystem services:   recreational fishing; boating; aesthetic information; disaster risk reduction; habitat; soil retention; and water quality.[90]   According to Mr. Batker, a benefits-transfer analysis "draws previously established values from valuation studies of similar goods or

---

[88] Ex. 1, Dep. of David Batker, at 41:18-42:6.
[89] Ex. 1, Dep. of David Batker, at 47:16-48:8.
[90] *See* Ex. 1, Dep. of David Batker, at 118:8-119:12; *see also* Ex. 2, Rep. of David Batker, at 22-26, 66.

8764616_5

services in identical or comparable locations" and applies the "derived values and other information from the original study site to a new, but sufficiently similar, site."[91]   Because Mr. Batker's benefits-transfer valuation is neither complete nor testable, his report and testimony are unreliable and should be excluded.

Mr. Batker admits that "[a] typical [benefits-transfer] study may use 120 values based on 120 different primary valuation studies."[92]   But Mr. Batker's analysis utilizes only nine (9) studies.[93]   His justification for using such a limited set of studies is that "to develop 120 new primary studies for a single site would be prohibitively expensive and ultimately impracticable . . . ."[94]   But an expert "must 'employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'"   *Wells v. SmithKline Beecham Corp.*, 601 F.3d 375, 378 (5th Cir. 2010) (quoting *Kumho Tire v. Carmichael*, 527 U.S. 135, 152 (1999)) (alteration in original).   The "excuse . . . that a thorough study would have required more time than [the expert] had available . . . is unacceptable." *Wessman v. Gittens*, 160 F.3d 790, 805 (1st Cir. 1998).   Further, during his deposition, Mr. Batker was unable to identify how he determined a value for "aesthetic information" based on his benefits-transfer analysis.[95]   And Mr. Batker considered only a limited set of "core" factors to ascertain whether a study was sufficiently similar to the Subject Property for the purposes of a

---

[91] Ex. 2, Rep. of David Batker, at 17; *see also* Ex. 1, Dep. of David Batker, at 160:2-:14.

[92] Ex. 2, Rep. of David Batker, at 18; *see also* Ex. 1, Dep. of David Batker, at 160:15-:20.

[93] Ex. 1, Dep. of David Batker, at 161:3-:8.

[94] Ex. 2, Rep. of David Batker, at 18; *see also* Ex. 1, Dep. of David Batker, at 160:21-161:2 (stating that he "used fewer values because [he's] not looking at as large of a landscape"); *id.* at 147:17-148:3 (indicating that he did not perform a survey "of what is actually done on the plaintiffs' property to determine the actual value placed on these services" because "you might have to do 20 studies[ a]nd it could take perhaps years to try to conduct all those studies").

[95] *See* Ex. 1, Dep. of David Batker, at 202:4-204:6 (inability to identify the values for aesthetic information in the Xu 2007 article on which Mr. Batker relied except by reference to an unreported calculation).

8764616_5

benefits-transfer.[96]   Thus, Mr. Batker's valuations could apply throughout the Coastal Zone in Plaquemines Parish, or even in the Breton Sound.[97]

Mr. Batker's benefits-transfer method suffers from another flaw; it is not testable.   "To establish reliability under *Daubert*, an expert bears the burden of furnishing 'some objective, independent validation of [his] methodology.'   'The expert's assurance that he has utilized generally accepted [principles] is insufficient.'"   *Brown v. Ill. Centr. R. Co.*, 705 F.3d 531, 536 (5th Cir. 2013) (quoting *Moore v. Ashland Chemical Co.*, 151 F.3d 269, 276 (5th Cir. 1998)) (alterations in original).   Mr. Batker cannot meet this burden because his benefits-transfer analysis relies entirely on the use of a proprietary database that is owned, operated, accessed, and purportedly validated by Earth Economics.[98]

Specifically, Mr. Batker uses a so-called "Ecosystem Valuation Toolkit" ("EVT"), which he describes as "a proprietary database of ecosystem and natural resource valuation studies developed and owned by Earth Economics."[99]   Mr. Batker admits that, because the EVT is proprietary, third-parties, including Defendants, "could not duplicate the database that [his] studies come from unless you gathered your own studies together."[100]   The only persons with access to the EVT are Earth Economics, its advisers, and certain researchers to whom Earth

---

[96] *See* Ex. 1, Dep. of David Batker, at 248:16-249:21 (identifying as "core" factors the presence of a brackish or saline wetlands environment; existence of embayments; presence of boating; placement within the Gulf; quality of the survey; and exclusion of deep-sea fishing).
[97] *See* Ex. 1, Dep. of David Batker, at 244:6-:20.
[98] *See* Ex. 2, Rep. of David Batker, at 22.
[99] Ex. 2, Rep. of David Batker, at 22.
[100] Ex. 1, Dep. of David Batker, at 163:5-:7; *see also id.* at 163:16-:20 ("Q.  You haven't provided access to the defendants to your toolkit; correct?  A.  No.  Q.  Is it publicly available?  A.  No.").

Economics has granted access.[101]  Not all of the articles in the EVT are peer-reviewed, and the EVT includes unpublished articles that Earth Economics alone decides are "more accurate."[102]

When asked during his deposition how a person could replicate Mr. Batker's use of the EVT, Mr. Batker agreed that a third party "would not be able to look at the full suite of articles" and instead would have to "do [its] own survey and look across the academic literature . . . ."[103] In other words, there is *no* means, other than accepting Mr. Batker's *ipse dixit*, to validate (1) the operation of the EVT; (2) Mr. Batker's decision to rely on certain articles from the EVT; and (3) Mr. Batker's rejection of other studies in the EVT.  Although Mr. Batker claims that the EVT is subject to a "double peer-review," in actuality that process is an internal review by an Earth Economics staff member and, possibly, an outside reviewer chosen by Earth Economics.[104]  Rule 702 of the Federal Rules of Evidence requires more before admitting expert testimony.  *See General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."); *In re Ondova Ltd.*, No. 09-34784-SGJ-11, 2012 WL 5879147, at *10 (Bankr. N.D. Tex. Nov. 21, 2012) ("After a *Daubert*-objection was lodged by the Receiver's counsel, the court did not let Dr. Lindenthal testify as to his opinion on the value of the Domain Names, because he could not share the methodology he used—it is proprietary information of Sedo, LLC."); *Olinger v. U.S. Golf Ass'n*, 52 F. Supp. 2d 947, 950

---

[101] Ex. 1, Dep. of David Batker, at 163:11-:15; *see also Ecosystem Valuation Toolkit*, Earth Economics, http://www.eartheconomics.org/ecosystem-valuation-toolkit (last visited June 20, 2017) ("At present, EVT is an internal tool for access by Earth Economics team members only.").

[102] Ex. 1, Dep. of David Batker, at 164:16-:23; *see also* Ex. 2, Rep. of David Batker, at 22 ("In some cases, where data is more current or accurate, values from non-peer-reviewed sources is [sic] utilized.").

[103] Ex. 1, Dep. of David Batker, at 165:16-166:3.

[104] *See* Ex. 1, Dep. of David Batker, at 168:15-:25; *see also* Ex. 2, Rep. of David Batker, at 22.

(N.D. Ind. 1999) ("This record discloses a well-credentialed expert who employs an undisclosed methodology to arrive at disclosed opinions. The court cannot evaluate the reliability of the undisclosed methodology or of the principles that support the methodology.").

Because Mr. Batker conducts an incomplete benefits-transfer analysis that is not independently testable, his report and testimony should be excluded.

>    **4.    Mr. Batker Relies on an Unsupported Assumption for Valuing Ecosystem Services**

Mr. Batker's "ecosystem services" valuations rely on a central, but unsupported, assumption—i.e., that a decrease in wetlands will result in a proportionate decrease in ecosystem services.   Mr. Batker provides no justification for this assumption, which undermines the reliability of Mr. Batker's entire testimony and report.

Mr. Batker assumes that, for each category of "ecosystem services" that he purports to value, a loss of wetlands also reduces benefits.  He applies this assumption for market values related to alligators;[105] market values for furbearers;[106] hunting and habitat values;[107] commercial fishing;[108] birdwatching;[109] boating;[110] and soil retention.[111]   Yet Mr. Batker admits that he has no site-specific evidence that land loss on the Subject Property reduces these benefits.[112] Further, Mr. Batker is unable to identify any study that validates the assumption.  When pressed

---

[105] Ex. 1, Dep. of David Batker, at 123:1-:5, 182:24-185:13.

[106] Ex. 1, Dep. of David Batker, at 130:4-133:18.

[107] Ex. 1, Dep. of David Batker, at 147:2-:4, 188:25-189:15.

[108] Ex. 1, Dep. of David Batker, at 186:18-188:24.

[109] Ex. 1, Dep. of David Batker, at 190:9-:12.

[110] Ex. 1, Dep. of David Batker, at 204:7-205:6.

[111] Ex. 1, Dep. of David Batker, at 227:20-228:4.

[112] *See* Ex. 1, Dep. of David Batker, at 125:8-:14 (no site-specific survey data for alligators); *id.* at 130:4-133:18 (no site-specific evidence for furbearers); *id.* at 137:11-141:13 (no site-specific data for commercial fishing or trapping); *id.* at 147:2-:4 (no survey information for duck hunting and habitat); *id.* at 158:11-:20 ("There is no survey evidence. . . . So if there's a reduction in wetlands, I would say it's a reasonable assumption that the population of birds was reduced.  We don't have any survey data.").

to do so, Mr. Batker stated that, for alligators, he "looked at the way that Louisiana Wildlife and Fisheries allocates tags to harvest the alligators."[113]   According to Mr. Batker, the Louisiana Department of Wildlife and Fisheries "base[s] those tags, the allocation of those tags, based on acreage of wetlands . . . .   If the number of acreage goes down, then you would harvest fewer alligators."[114]

Mr. Batker did not speak with anyone at the Louisiana Department of Wildlife and Fisheries to verify the accuracy of his assumption,[115] but even if he had, Mr. Batker's reasoning is circular.   In other words, Mr. Batker avers that his assumption is reasonable because the Louisiana Department of Wildlife and Fisheries allocates alligator tags on a per-acre basis, and the agency makes those allocations because it assumes that alligator populations decrease with decreasing wetlands acreage.[116] Mr. Batker likewise fails to identify support for this assumption for the other ecosystem services he considers,[117] justifying exclusion of his report and testimony. *See Hathaway v. Bazany*, 507 F.3d 312, 318-19 (5th Cir. 2007) (affirming the district court's decision to exclude an expert affidavit where the expert "d[id] not . . . offer any specific factual support for the reliability of his initial assumptions."); *Moore v. BASF Corp.*, No. 11-1001, 2012 WL 6002831, at *4 (E.D. La. Nov. 30, 2012) (excluding an expert's opinion that was "not based

---

[113] Ex. 1, Dep. of David Batker, at 183:8-:10.

[114] Ex. 1, Dep. of David Batker, at 183:10-:14.

[115] *See* Ex. 1, Dep. of David Batker, at 185:10-:13.

[116] *See* Ex. 1, Dep. of David Batker, at 182:24-185:13.

[117] *See* Ex. 1, Dep. of David Batker, at 186:18-188:24 (Mr. Batker relied on two models showing a decrease in commercial fishing with decreasing wetlands but had no information about the input variables for the models); *id.* at 188:25-189:15 (no support for decreasing duck populations because Mr. Batker "considered that pretty common knowledge"); *id.* at 190:3-:12 (no literature for bird populations); 193:3-:6 (Mr. Batker "can't say" whether the Louisiana Department of Wildlife and Fisheries can support the assumptions of decreasing alligator and furbearer populations with decreasing wetlands); *id.* at 204:11-205:6 (no identifiable article supporting a reduction in boating); *id.* at 227:20-228:4 (referring to an article by Dr. John Day to show that soil retention "is an attribute that wetlands have" but not justifying the assumption that a decrease in wetlands results in a decrease in soil retention).

on disputed facts but rather on a series of assumptions that have not been tested"); *Baker v. Anschutz Exploration Corp.*, No. 11-CV-6119 CJS, 2016 WL 981858, at *4 (W.D.N.Y. Mar. 15, 2016) ("As the Court pointed out in its first decision, Ru-bin's circular reasoning fails to reveal a sufficiently rigorous analytical connection between his methodology and his opinion.").[118]

Mr. Batker's testimony and report rely on an unsupported assumption that undermines the reliability of his analysis.  Exclusion of Mr. Batker's testimony and report is warranted.

### 5.      Mr. Batker's Analysis of Future Damages Is Speculative

In addition to assessing historic harms to "ecosystem services" on the Subject Property, Mr. Batker projects future losses to the property through 2070.[119]  This analysis is speculative and unreliable and should be excluded.

Mr. Batker admits that, if the Court orders restoration of the Subject Property, future damages are irrelevant.[120]  Nonetheless, Mr. Batker predicts future losses to the Subject Property by assuming that "land loss . . . would continue at the same rate in the future as has transpired in the past . . . ."[121]  He concludes that, by 2070, the Subject Property will have lost a cumulative 97.5 acres, including 16.2 acres of freshwater wetlands that are not currently on the property.[122] But Mr. Batker agrees that the CEI report on which he relies did not address future land loss on the Subject Property through 2070.[123]  He also concedes that future land loss is speculative.[124]

---

[118]  The effect of Mr. Batker's assumption is severe since it implies that Plaintiffs lose one hundred percent (100%) of ecosystem benefits for each acre of land lost.  *See* Ex. 1, Dep. of David Batker, at 192:22-:24 ("Yes, this is like an appraisal approach.  Yes, if you lose that acre, you lose 100 percent of those benefits.").

[119]  *See* Ex. 2, Rep. of David Batker, at 28-36.

[120]  Ex. 1, Dep. of David Batker, at 270:7-:10.

[121]  Ex. 2, Rep. of David Batker, at 28.

[122]  Ex. 2, Rep. of David Batker, at 29; *see also* Ex. 1, Dep. of David Batker, at 278:24-279:2 ("Q. As we sit here today, there is absolutely zero freshwater wetland habitat on the plaintiffs' property; correct?  A.  Correct.").

[123]  Ex. 1, Dep. of David Batker, at 275:4-:13.

The Fifth Circuit has admonished that "[u]nder the *Daubert* regime, trial courts are encouraged to exclude such speculative testimony as lacking any scientific validity," and there is no reason for this Court to reach a different conclusion with regard to Mr. Batker's testimony and report. *Moore v. Ashland Chemical Co.*, 151 F.3d 269, 279 (5th Cir. 1998).[125]

Because Mr. Batker's analysis of future losses on the Subject Property is bare speculation, it should be excluded.

## V.    CONCLUSION

For the reasons stated herein, Defendants respectfully request that the Court grant this motion and exclude the testimony and report of Mr. David Batker, Earth Economics from trial in this matter.

---

[124] *See* Ex. 1, Dep. of David Batker, at 270:19-:22 ("Q.  Future land loss is purely speculative. We don't know what's going to happen in the future; correct?  A.  Correct, it's a projection."); *id.* at 273:14-:21 ("Q.  And, again, with respect to any future land loss and the causes of that land loss it is pure speculation.  One, if a land loss is going to occur, correct, at this point?  A.  It is – yes.  Anything you say about the future is a prediction even though – you know it's – we'll all leave this room at the end of the day.").

[125] Further, in forming this opinion, Mr. Batker relies on the so-called Delf3D model of wetland loss from the Water Institute of the Gulf.  Ex. 2, Rep. of David Batker, at 28.  But he admits that the resolution of the Delf3D model is lacking.  Ex. 1, Dep. of David Batker, at 275:4-:13; Ex. 2, Rep. of David Batker, at 28 ("The model does not provide the resolution useful for estimating the land loss on the Vintage Assets property due to the lack of canal maintenance . . . .").  Mr. Batker is also unable to explain why the model predicts a freshwater wetlands habitat on the Subject Property in the future.  Ex. 1, Dep. of David Batker, at 277:24-278:28 ("Q.  How is it getting fresher over time?  A. . . . That's their modeling, so we didn't question their modeling. . . . I don't know what they used for Delft3D modeling. . . . But their projection, for whatever reasons, they did their scientific analysis projecting how freshwater wetlands were going to be propagated.").

Respectfully submitted:


/s/ Richard D. McConnell, Jr.
Richard D. McConnell, Jr., (#29973)
Esteban Herrera, Jr., (#20859)
Jeffrey N. Boudreaux, (#26810)
Sam Lumpkin, (#35213)
**KEAN MILLER LLP**
400 Convention Street, Suite 700
P. O. Box 3513 (70821-3513)
Baton Rouge, LA  70802
Telephone:  (225) 387-0999
Facsimile:  (225) 388-9133
richard.mcconnell@keanmiller.com
esteban.herrera@keanmiller.com
jeffrey.boudreaux@keanmiller.com
sam.lumpkin@keanmiller.com

and

Michael R. Phillips, (#21020)
Claire E. Juneau, (#33209)
Tyler Moore Kostal, (#33289)
**KEAN MILLER LLP**
First Bank and Trust Tower
909 Poydras St., Suite 3600
New Orleans, LA 70112
Telephone:  (504) 585-3050
Facsimile:  (504) 585-3051
mike.phillips@keanmiller.com
claire.juneau@keanmiller.com
tyler.kostal@keanmiller.com

***Attorneys for Defendants Tennessee Gas
Pipeline Company, L.L.C., Southern Natural
Gas Company, L.L.C., High Point Gas
Transmission, L.L.C., and High Point Gas
Gathering, L.L.C.***

8764616_5

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which in turn sent notice of this filing to all counsel of record registered to receive electronic service.

Baton Rouge, Louisiana, this 27th day of June, 2017.

/s/ Richard D. McConnell, Jr.
Richard D. McConnell, Jr. (#29973)

27