UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

VINTAGE ASSETS, INC. ET AL.                CIVIL ACTION

VERSUS                                      NO: 16-713

TENNESSEE GAS
PIPELINE CO. LLC ET AL.                    SECTION: "H"(1)

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Between 1953 and 1970, Defendants' predecessors received eight right-of-way servitudes, ranging from 100 to 175 feet in width, crossing various portions of Plaintiffs' property, which authorized the construction and operation of pipelines and dredge canals. The servitude agreements allowed Defendants to lay the pipelines in canals "not to exceed 40 [or in some cases 65] feet in width." Plaintiffs allege that Defendants failed to maintain these canals, resulting in erosion and damage to their property. It is undisputed that the widths of the canals now far exceed that which was established by the servitude agreements. Plaintiffs brought state law claims for trespass, breach of contract, and negligence.

This Court made several pre-trial rulings as a result of a series of summary judgment motions. Plaintiffs' tort claims for negligence and trespass were dismissed with prejudice. Plaintiffs' claims for breach of the servitude agreements signed in August 1957 and July 1958, which did not specify a canal or right-of-way width, were dismissed with prejudice.[1] This ruling eliminated all of Plaintiffs' claims regarding the pipeline designated as 500-1. The Court also held that Defendants had breached their duties to maintain the canals created by servitude agreements signed in 1953, 1958, 1964, and 1970. Plaintiffs' claims for breach of the obligation to build a dam or bulkhead under the two contracts signed in 1970 remained for trial.

At a bench trial between September 15 and 26, 2017, the Court heard evidence on damages and causation as to Defendants' breaches of the 1953, 1958, 1964, and 1970 contracts, as well as Plaintiffs' claims for breach of the obligation to build dams or bulkheads under the 1970 contracts, including whether that claim has prescribed. The parties each submitted evidence in support of their positions. Plaintiffs contend that Defendants should be required to restore their land and the canals to their not-to-exceed widths, a plan which they submit will cost more than $30 million. Defendants contend that Plaintiffs are entitled to only the value of the land lost, an amount totaling $8,000. The Court finds, however, that the facts of this case do not lend themselves to a zero sum game. Unfortunately, the parties' pursuit of total victory has left this Court without all of the tools desirable to effectively parse through the intricacies of this case. Alas, this Court will award damages "as a matter of just and reasonable inference, although the result be only

---

[1] Doc. 218.

2

approximate." *Sulzer Carbomedics, Inc. v. Oregon Cardio-Devices, Inc.*, 257 F.3d 449, 459–60 (5th Cir. 2001).

Having considered the evidence admitted at trial, the arguments of counsel, and the post-trial briefing, this Court makes the following findings of fact and conclusions of law. To the extent a finding of fact constitutes a conclusion of law, and vice versa, the Court adopts it as such.

## **FINDINGS OF FACT**

1. Plaintiffs are Vintage Assets, Inc.; Jacques Perez de La Vergne; Suzanne de La Vergne McIntosh; Anne Perez Inabnett; Susan Perez Magee; Joan Elizabeth Heather Huey; John R. Perez, III; Arthur S. Huey, IV; Renee Perez Sachs; and Mercedes Perez Mack Exempt Trust.

2. Plaintiffs are descendants of John R. Perez, Sr. Plaintiffs are the successors in title to Upper Realty, Inc.; Manning Oil Corporation; LaPlaq Realty, Inc.; Lenmark Lands, Inc.; and Lower Minerals, Inc. ("the Companies"), which were closely held companies owned by John R. Perez, Sr., grandfather to certain Plaintiffs, and later by John Perez, Jr., his son.

3. Plaintiffs own land in the Breton Sound Basin on the east bank of Plaquemines Parish, Louisiana (the "Subject Property").

4. Specifically, the following property in Plaquemines Parish, Louisiana, is at issue in this lawsuit: Sections 17, 24, 31, and 32, Township 16 South, Range 15 East; the north half of Section 19 and the northwest quarter of Section 20, Township 16 South, Range 15 East; and the northeast quarter and south half of Section 5, Township 17 South, Range 15 East.

5. The Subject Property, which is part of the Breton Sound Basin land bridge, is primarily categorized as a brackish and salt marsh and is a stable marsh area.

6. The Subject Property has been in Plaintiffs' family for four generations. Together, Plaintiffs own an undivided interest in the Subject Property.

7. Plaintiff, the Mercedes Perez Mack Exempt Trust, owns a 1/3 interest in the Subject Property. The beneficiary of the Mercedes Perez Mack Trust is Kathy Mack. The Mercedes Perez Mack Exempt Trust is managed by Whitney Bank.

8. Plaintiff Anne Perez Inabnett owns a 1/12th interest in the Subject Property.

9. Plaintiff Renee Perez Gurley owns a 1/12th interest in the Subject Property.

10. Plaintiff Susan Perez Magee owns a 1/12th interest in the Subject Property.

11. Plaintiff John R. Perez, III owns a 1/12th interest in the Subject Property.

12. Plaintiff Vintage Assets, Inc. owns a 1/9th interest in the Subject Property. It acquired its interest from and is owned by Jacques Perez de la Vergne. Plaintiff Jacques Perez de la Vergne retained a 1% interest in all causes of action arising from the Subject Property.

13. Plaintiff Suzanne de la Vergne McIntosh owns a 1/9th interest in the Subject Property.

14. Plaintiff Arthur S. Huey, IV, owns a 1/27th interest in the Subject Property.

15. Plaintiff Joan Elizabeth Heather Huey owns a 2/27th interest in the Subject Property.

16. Defendants are Tennessee Gas Pipeline Company, L.L.C. ("TGP"), Southern Natural Gas Company, L.L.C. ("SNG"), High Point Gas Transmission, L.L.C. ("HPGT"), and High Point Gas Gathering, L.L.C. ("HPGG").

17. From 1953 until 1970, Plaintiffs' predecessors, acting on behalf of the Companies, granted eight right-of-way ("ROW") agreements to TGP and SNG that covered the Subject Property, six of which remain at issue for the trial of Plaintiffs' claims.

18. On January 9, 1953, Upper Realty, Inc. granted a ROW covering portions of Section 31 in Township 16 South, Range 15 East ("Tract 6") and Section 32 in Township 16 South, Range 15 East ("Tract 7"), to SNG ("the 1953 Upper Realty ROW"). The 1953 Upper Realty ROW agreement granted SNG a right-of-way and easement 100 feet in width within which to operate a pipeline. The agreement allowed the pipeline to lay in "open ditches or canals not to exceed 40 feet in width, which may be filled in or left open at the option of Grantee."

19. Sections 31 and 32 were referred to as Tracts 6 and 7, respectively, throughout the course of this trial.

20. On June 15, 1970, Upper Realty, Inc. granted a ROW covering portions of the same parcel to SNG for the purpose of installing a second parallel pipeline (the "1970 Upper Realty ROW"). The agreement granted SNG a 175-foot pipeline easement, including "the right to lay such pipeline in an open ditch or canal," and the right to widen the existing 40-foot canal

by an additional 25 feet. In the agreement, SNG also agreed to dam or bulkhead the canal at the points where the canal enters and leaves the property.

21. On January 9, 1953, Lenmark Lands, Inc. granted a ROW covering portions of Section 5 in Township 17 South, Range 15 East ("Tract 1") to SNG, with provisions identical to the 1953 Upper Realty ROW ("the 1953 Lenmark ROW").

22. The property within Section 5 was referred to as Tract 1 throughout the course of the trial.

23. On June 15, 1970, Lenmark Lands, et al., granted a new ROW covering portions of Tract 1 to SNG for the purpose of laying a pipeline parallel to the 1953 Lenmark ROW ("the 1970 Lenmark ROW"). The provisions of the 1970 Lenmark ROW were substantively identical to the 1970 Upper Realty ROW.

24. SNG constructed and installed the first pipeline (the Main Pass Franklinton Line) under the 1953 Upper Realty and 1953 Lenmark Lands ROWs. SNG constructed a second pipeline (the Main Pass-Franklinton Loop) pursuant to the 1970 Upper Realty and the 1970 Lenmark ROWs.

25. SNG ultimately transferred its interest in the 1953 and 1970 Upper Realty ROWs and the 1953 and 1970 Lenmark ROWs to HGPT, and HGPT is the current grantee of those ROWs.

26. The width of the canal in which these pipelines lie now far exceeds 65 feet. In 2015, the width of the canal ranged from 145.4 to 161.5 feet.

27. On February 13, 1958, the Manning Oil Co. granted a ROW to SNG ("the 1958 Manning ROW") covering portions of Section 19 in Township 16 South, Range 16 East ("Tract 3"), Section 20 in Township 16 South, Range 16 East ("Tract 4"), and Section 24 in Township 16 South, Range 15 East ("Tract 5"). The 1958 Manning ROW agreement granted a 100-foot easement and the right to lay pipelines in "open ditches or canals not to exceed 40 feet in width, which may be filled in or left open at the option of Grantee."

28. Throughout this trial, the portion of the Subject Property in Section 19 was referred to as Tract 3, in Section 20 was referred to as Tract 4, and in Section 24 was referred to as Tract 5.

29. SNG constructed the Black Bay Line, crossing Tracts 3, 4, and 5, pursuant to the 1958 Manning ROW. HPGG is the current grantee of the ROW.

30. The current width of the canal in which this pipeline lies now far exceeds 40 feet. In 2015, the width of the canal ranged from 76.7 to 102.2 feet.

31. On May 1, 1964, the Companies granted a ROW to TGP ("the 1964 Upper Realty ROW") covering portions of Tract 1, Tract 7, and Section 17, Township 17 South, Range 15 East ("Tract 2"). The agreement granted a pipeline easement, stating that "the open ditch or canal which Grantee may dig will be dug to a minimum depth of approximately minus six feet (-6') below mean low gulf level and will not exceed forty (40') feet in width at the top."

7

32. TGP constructed a canal for its 500-2 pipeline pursuant to the 1964 Upper Realty ROW, which traverses Tracts 1, 2, and 7 of Plaintiffs' property. TGP is the current grantee of the 1964 Upper Realty ROW.
33. The width of the canal in which this pipeline lies now far exceeds 40 feet. In 2015, the width of the canal ranged from 102.8 to 129.7 feet as it transected Tract 2 and 90.7 to 110.8 feet as it transected Tract 7.
34. The 1953 Upper Realty and Lenmark ROWs and the 1958 Manning Oil ROW prohibit Plaintiffs from constructing any obstruction over the rights of way or changing the grade over the pipelines therein.
35. Each of the pipelines at issue herein remain in operation. None of the Defendants have conducted any activities to maintain the canals at their originally dredged widths.
36. In some instances, the canals have eroded into open water.
37. All of the canals dredged pursuant to the agreements at issue here were left open, and no dams or bulkheads were installed anywhere on the Subject Property.
38. Plaintiffs did not know prior to the ten years preceding the filing of this lawsuit that no dams had been installed.
39. Defendants did not know whether or not dams or bulkheads had been installed.
40. A dam or bulkhead would have helped to prevent erosion of the interior of the Subject Property.
41. Plaintiffs did not visit the Subject Property.

42. The Subject Property is unmarked, undeveloped marsh land, and it would be difficult for a visitor to differentiate the Plaintiffs' property from the property surrounding it.

43. At the time the parties entered into the aforementioned agreements, Defendants, and the oil industry in general, were aware that the failure to maintain the pipeline canals would result in erosion of the land and widening of the canals. Accordingly, the damage at issue here was foreseeable.

44. The erosion of the Plaintiffs' land was caused by a combination of natural processes, including boat wakes, currents, and wind, some of which may have occurred notwithstanding the dredging of the canals. These erosive forces, however, would not have acted on the stable interior portions of Plaintiffs' land if not for the Defendants' failure to maintain the canals.

45. Repair of portions of Plaintiffs' land has become necessary because of Defendants' neglect in failing to maintain the canal banks.

46. The Court finds the analysis of land loss by Defendants' expert, Mark Byrnes, to be credible. Much of the land loss included in Plaintiffs' calculations was a result of natural edge erosion. The Court finds that no maintenance activity would have prevented this natural edge erosion from taking place. Mr. Byrne's calculations more appropriately took these factors into consideration. Accordingly, this Court has used Mr. Byrne's calculation of lost acreage in determining Plaintiffs' damages.

47. According to Mr. Byrne's calculations, the total land lost due to canal widening from the time of the construction of the canals to 2015 was 15.12 acres.

48. This land loss would not have occurred if the canal banks had been maintained.
49. The market value of Plaintiffs' land is $200 per acre.
50. Each of the Plaintiffs desires to restore the land that was lost.
51. Plaintiffs' engineering expert, David O'Reilly, submitted four variations of a plan for restoration of the land lost as a result of Defendants' breach. These plans were still in the design phase.
52. Two of the variations for restoration proposed by Mr. O'Reilly called for backfilling of the canals. The servitude agreements do not entitle Plaintiffs to have the canals backfilled.
53. Of the other two restoration plan variations, Option 3 calls for borrowing material from adjacent lakes and canals at a cost of $32,418,326.21, while Option 1 proposes borrowing material from the Mississippi River at a cost of $36,413,612.18.
54. Each plan suggests restoration of areas in Tracts 1, 2, 5, 6, and 7 using rock berms, geotextiles, and borrow material.
55. Mr. O'Reilly did not submit any plan for restoration of the land lost in Tracts 3 and 4, which totaled 2.69 acres.
56. As to Tract 1, which has lost 1.31 acres of land as a result of Defendants' failure to maintain the canals, O'Reilly's plan recommends shoreline stabilization and restoration of a small area of the tract.
57. As to Tract 2, which lost 4.59 acres as a result of Defendants' breach, Mr. O'Reilly's plan would use three rock berms and borrow material to restore and stabilize the canal bank.

58. As to Tract 5, which lost 1.82 acres of land, Mr. O'Reilly's plan would restore some, but not all, of the areas of land loss. Mr. O'Reilly's plan does not seek to restore the two easternmost portions of land lost, which amount to roughly 50% of the land lost in Tract 5.

59. As to Tract 6, which lost 1.83 acres of land, Mr. O'Reilly proposes using a double rock berm and borrow material to stabilize and restore the area.

60. As for the area surrounding the SNG canal in Tract 7, which lost 0.81 acres, Mr. O'Reilly would restore some, but not all, of the areas of land loss.

61. As for the area surrounding the TGP canal in Tract 7, which has lost 2.07 acres, Mr. O'Reilly proposes using three rock berms and borrow material to restore and stabilize the canal banks.

62. This Court finds that the cost of Mr. O'Reilly's plan to restore some of the areas of Plaintiffs' property will exceed the benefit of restoration in those particular areas. These areas are Tract 1 and about 75% of the area surrounding the SNG canal in Tract 7.

63. In Tract 1, three canals run through an island, which has eroded both from the interior and exterior. Natural erosive forces will continue to erode the island from its exterior, and therefore, restoration of the interior of the island would be futile and only forestall the inevitable erosion of this island.

64. In the majority of the area surrounding the SNG canal in Tract 7, erosion as a result of the dredging of the canal has caused only a small amount of land loss on the edges of more substantial land masses. Restoration of these areas would be greatly disproportionate in cost to the actual

damage, especially in light of the erosive forces that will continue to work on the edges of this land. However, in the northwesternmost corner of the tract, the canal was dredged through the Plaintiffs' property, resulting in land loss and erosion from the interior. Accordingly, restoration of this portion, which amounts to roughly 25% of the land lost near the SNG canal in Tract 7, is appropriate and not greatly disproportionate to its cost.

65. The acreage of the land lost in Tract 1, 75% of the area surrounding the SNG canal in Tract 7, and the areas for which Mr. O'Reilly did not submit a restoration plan (Tracts 3, 4, and 50% of Tract 5) amounts to 5.52 acres. These areas are not suitable for restoration.

66. Restoration of the land lost in Tracts 2, 6, the westernmost portion of Tract 5, the area surrounding TGP's 500-2 pipeline canal in Tract 7, and the northwesternmost portion of the area surrounding the SNG canal in Tract 7 is feasible and its benefit is not outweighed by its cost. These areas lost a total of 9.6 acres of land as a result of Defendants' failure to maintain the canals.

67. Defendants' failure to install dams or bulkheads pursuant to the 1970 Upper Realty and Lenmark ROWs contributed to the erosion and land loss discussed above.

68. Defendants failed to show that any part of Plaintiffs' property has eroded into a natural navigable water body such that they have lost ownership of such.

# CONCLUSIONS OF LAW

69. Louisiana law applies to this diversity action.

70. The law of prescription does not limit Plaintiffs to damages for harms incurred within ten years of the filing of this lawsuit, as Defendants have argued.

71. Defendants seek a reduction in damages for Plaintiffs' failure to mitigate damages. "An obligee must make reasonable efforts to mitigate the damage caused by the obligor's failure to perform. When an obligee fails to make these efforts, the obligor may demand that the damages be accordingly reduced." LA. CIV. CODE art. 2002.

72. Defendants are not entitled to a reduction in damages for Plaintiffs' failure to mitigate where the ROW agreements prevented Plaintiffs from obstructing the canals or changing the grade over the pipelines.

## Obligation to Maintain Canal Banks

### *Restoration*

73. Although throughout the course of this litigation, the parties have referred to the rights-of-way at issue as predial servitudes, they are more appropriately classified as rights of use. A right of use is a "personal servitude that confers a benefit similar to a predial servitude upon a person rather than upon an estate." PETER TITLE, LOUISIANA PRACTICE SERIES § 3:44 (2d ed.); LA. CIV. CODE arts. 639–41; *see Rose v. Tenn. Gas Pipeline Co.*, 508 F.3d 773, 777 (5th Cir. 2007) ("Even though [pipeline] rights of way similar to that granted to TGP are frequently characterized as predial servitudes, . . . perhaps the interest in question might be better

classified as a personal servitude because it confers a benefit in favor of a juridical person, TGP, rather than an immovable.").

74. "A right of use is regulated by application of the rules governing usufruct and predial servitudes to the extent that their application is compatible with the rules governing a right of use servitude." LA. CIV. CODE art. 645.

75. Defendants have a continuing obligation under the aforementioned ROWs and Louisiana suppletive law to refrain from aggravating the servient estate. *See Rose v. Tenn. Gas Transmission Co.*, No. 05-3102, 2009 WL 4891910, at *2 (E.D. La. Dec. 8, 2009); Doc. 218.

76. The failure to maintain the canals dredged pursuant to the aforementioned ROW agreements at their not-to-exceed widths was a breach of those agreements. *See* Doc. 218.

77. A usufructuary is bound to, at his own cost, make repairs that "have become necessary as a result of the usufructuary's fault or neglect." LA. CIV. CODE art. 577. "During the existence of the usufruct, the naked owner may compel the usufructuary to make the repairs for which the usufructuay is responsible." LA. CIV. CODE art. 579.

78. Defendants are obligated to repair Plaintiffs' land, at their expense, where their failure to maintain the canals made such repairs necessary.

79. "Upon a failure to perform an obligation that has another object, such as an obligation to do, the granting of specific performance is at the discretion of the court." LA. CIV. CODE art. 1986.

80. "An obligee has a right to specific performance for breach of contract except when it is impossible, greatly disproportionate in cost to the actual damage caused, no longer in the creditor's interest, or of

substantial negative effect upon the interests of third parties." *Charter Sch. of Pine Grove, Inc. v. St. Helena Par. Sch. Bd.*, 9 So. 3d 209, 222 (La. App. 1 Cir. 2009) (citing *J. Weingarten, Inc. v. Northgate Mall, Inc.*, 404 So. 2d 896, 901 (La. 1981)). "When specific performance is impracticable or when the court, in its discretion, refuses to grant specific performance of an obligation to do, the court may instead fix damages." *Id.*

81. "The remedy of specific performance may, under some circumstances, be enforced by injunction." *Id.*

82. "The decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court" in which the court may balance the equities. *Abraham v. Alpha Chi Omega*, 708 F.3d 614, 627 (5th Cir. 2013).

83. As discussed above, the restoration plan proposed by Plaintiffs is greatly disproportionate in cost to the actual damage caused to Tract 1 and 75% of the area surrounding the SNG canal in Tract 7. Accordingly, specific performance for the restoration of those areas is inappropriate, and Plaintiffs are entitled to damages.

84. Repair of the damage to Tracts 2, 6, and portions of Tract 5 and 7, however, is feasible and its cost is not greatly disproportionate to the actual damage caused or the benefit of restoration.

85. Plaintiffs are entitled to a permanent injunction ordering Defendants to perform the construction and repairs necessary to restore, at Defendants' expense, the land lost due to Defendants' fault in Tracts 2, 6, and portions of Tract 5 and 7, as identified above. The canal in Tract 6 should

be restored to a width of 65 feet, while the canals in each of the other tracts should be restored to a width of 40 feet.

86. Defendants SNG and HGPT are liable for the restoration of Tract 6 and the SNG canal portion of Tract 7. TGP is liable for the restoration of Tract 2 and the TGP portion of Tract 7. SNG and HPGG are liable for the restoration of Tract 5.

87. The Court has attached to this Order and Reasons maps clarifying the areas intended for restoration. Those areas included in the black boxes placed on the maps of each tract shall be restored.

88. Following restoration, Plaintiffs are entitled to an injunction requiring Defendants to maintain these canals at the widths designated by the ROWs for the life of the ROW agreements.

*Damages*

89. Damages for breach of contract are "measured by the loss sustained by the obligee and the profit of which he has been deprived." LA. CIV. CODE art. 1995.

90. "An obligor in good faith is liable only for the damages that were foreseeable at the time the contract was made." LA. CIV. CODE art. 1996.

91. Defendants acted in good faith.

92. It was foreseeable at the formation of the right-of-way agreements that the failure to maintain the canals contracted for would result in their widening.

93. Plaintiffs are therefore entitled to the market value of the 5.52 acres of land lost that cannot be restored.

94. Judgment shall be entered in favor of Plaintiffs in the amount of $1,104.00 for the damage Defendants caused in Tracts 1, 3, 4, and portions of Tract 5 and Tract 7 by their failure to maintain the canals pursuant to the ROW agreements.
95. Defendants SNG, TPG, and HPGT are liable for the 1.31 acres lost in Tract 1 in the amount of $262.00. Defendants SNG and HPGG are liable for the 3.60 acres lost in Tracts 3, 4, and the easternmost half of Tract 5 in the amount of $720.00. Defendants SNG and HPGT are responsible for the 0.61 acres lost near its canal in Tract 7 in the amount of $122.00.

## **Obligation to Install Dams and Bulkheads**

96. At the outset, Defendants argue that Plaintiffs' claim for breach of the obligation to install dams or bulkheads pursuant to the 1970 Upper Realty or Lenmark ROWs is prescribed.
97. Breach of contract claims are subject to a prescriptive period of ten years. *See* LA. CIV. CODE art. 3499.
98. This Court has already held that this claim is facially prescribed. Doc. 218.
99. The discovery rule of *contra non valentem* applies to suspend the running of prescription until Plaintiffs "knew, or reasonably should have known of the damage." *Marin v. Exxon Mobil Corp.*, 48 So. 3d 234, 245 (La. 2010).
100. Plaintiffs neither knew nor should have known of Defendant's failure to install dams or bulkheads prior to ten years before the filing of this lawsuit. Even if Plaintiffs had visited the Subject Property, it would have

been difficult to determine where a dam or bulkhead should have been located. Indeed, even Defendants were not aware whether dams had been constructed.

101. Plaintiffs' claim for breach of the obligation to install a dam or bulkhead has not prescribed.

102. "The essential elements of a breach of contract claim are (1) the obligor's undertaking an obligation to perform, (2) the obligor failed to perform the obligation (the breach), and (3) the failure to perform resulted in damages to the obligee." *Favrot v. Favrot*, 68 So. 3d 1099, 1108–09 (La. App. 4 Cir. 2011).

103. Defendants were obligated under the 1970 Upper Realty and the 1970 Lenmark ROWs to install dams or bulkheads "at the point where the canal enters and leaves" Plaintiffs' property. This obligation should have resulted in the construction of a dam or bulkhead on the SNG canal in Tracts 1 and 6.

104. Defendants breached this obligation by failing to construct any dams or bulkheads.

105. While Plaintiffs failed to show exactly what damages resulted specifically from Defendants' failure to dam or bulkhead the canal, it is clear that at least some of the erosion and land loss of the Subject Property resulted from this failure.

106. Accordingly, Plaintiffs have proven each element of their claims for Defendants' breach of the obligations to install dams or bulkheads pursuant to the 1970 Upper Realty and the 1970 Lenmark ROWs.

107. Specific performance of the obligation to install dams or bulkheads is inappropriate. Due to the land lost and edge erosion in Tract 1, such relief is now impossible in that tract. In addition, requiring Defendants to build a dam in Tract 6 is unnecessary in light of the relief already granted. Because Defendants are required to maintain the canal in Tract 6 at 65 feet, the installation of a dam in that tract would be duplicative.
108. Damages for the land lost have already been awarded. Plaintiffs have not shown that the failure to install dams or bulkheads caused any damage over and above that caused by the failure to maintain the canals.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs are entitled to judgment on their remaining claims in the amount of $1,104.00 and injunctive relief for the restoration of 9.6 acres. A permanent injunction shall issue separately. The Court intends to appoint a special master pursuant to Federal Rule of Civil Procedure 53 to oversee the restoration of Plaintiffs' land.

Accordingly;

**IT IS ORDERED** that each party shall, within 30 days of this Order, submit three recommendations with curriculum vitae of individuals to serve in the capacity of special master. A special master will be selected by the Court thereafter.

**IT IS FURTHER ORDERED** that the effects of this Order and the separately entered Judgment and Permanent Injunction are **STAYED** pending final ruling on appeal.

New Orleans, Louisiana this 4th day of May, 2018.

_____
**JANE TRICHE MILAZZO
UNITED STATES DISTRICT JUDGE**